## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **RICHARD ROBERT HUGHES,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. JKB-23-1993** |
| **M&T BANK, et al.,** | * | |
| **Defendants.** | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### MEMORANDUM

Richard Robert Hughes, proceeding pro se, sued M&T Bank and various of its employees for intentional infliction of emotional distress ("IIED") based on a dispute that occurred at the bank's South Cumberland branch in late 2021. (*See generally* ECF No. 19 at 1–3; ECF Nos. 22, 31.) Now pending is Defendants' Motion for Summary Judgment. (ECF No. 48.) The Motion is fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2023).

For the reasons set forth below, the Motion will be granted. A separate order will issue to effectuate this decision.

### I.    BACKGROUND

#### A.    Factual Background[1]

On December 30, 2021, Hughes visited the South Cumberland branch of M&T Bank in Cumberland, Maryland ("Branch").[2] (ECF No. 48-2 at 12.) Hughes had not visited the Branch in

---

[1] Unless otherwise noted, all facts are undisputed. Pincites refer to the page numbers of documents as they appear on the electronic docket, which numbers are typically—but not always—stamped onto the top of each individual page. These numbers are not necessarily the same as the page numbers that appear in the documents' original text.

[2] In their responses to Hughes's discovery requests, Defendants note repeatedly that M&T Bank Corporation "does not have any branches," (*see, e.g.*, ECF No. 50 at 4–7), but that its subsidiary, Manufacturers and Traders Trust Company, doing business as M&T Bank, does, (*id.* at 5–7). For purposes of this decision, the distinction is unimportant, and the Court will use "M&T Bank" as a shorthand for the M&T Bank family of businesses.

fifteen to eighteen years. (*Id.* at 14, 31–32.) He says he visited in late 2021 only because his ailing

mother requested that he withdraw money on her behalf to begin settling her affairs. (*See id.* at

12, 16; ECF No. 22 at 4, 6.) Around 11:51 a.m., Hughes went inside while his mother and his

companion waited in the car. (ECF No. 48-2 at 15; ECF No. 22 at 10.)

Hughes approached the counter and spoke to Camala Shafer, one of the Branch's tellers.

(ECF No. 48-2 at 15–16.) Hughes says he first asked how much money his mother could withdraw

"before [he] had brought her in," explaining that his mother had cancer and used a wheelchair and

an oxygen tank. (*Id.* at 16.) But Defendants assert Hughes "initially requested to make a

$100,000.00 withdrawal from his mother's account." (ECF No. 48-1 at 4.) Either way, Shafer

asked for Hughes's name, then declined to provide information about Hughes's mother's finances,

informing Hughes that he was "not on [his mother's] account." (ECF No. 48-2 at 16.) Hughes

exited the bank and spoke with his mother, who disputed that Hughes was not an authorized user.

(*See id.*) She then gave him her bank card so he could try again. (*See id.*)

Hughes reentered the bank around 11:55 a.m. and approached Shafer a second time. (*See*

ECF No. 22 at 10; ECF No. 48-2 at 17.) Sometime around then, Hughes claims Shafer laughed.

(ECF No. 22 at 10.) Hughes showed Shafer his driver's license and his mother's bank card. (ECF

No. 48-2 at 17.) Shafer informed Hughes that he was "still not on the account but [was] a

beneficiary." (*Id.*) Hughes responded "okay, then I'll bring my mother in." (*Id.*) He went back

outside and helped his mother into her wheelchair. (*Id.* at 17–18.)

Hughes wheeled his mother into the bank around 12:02 p.m. and approached Shafer a third

time. (*See* ECF No. 22 at 10; ECF No. 48-2 at 18–19.) Shafer asked Hughes's mother what she

wanted to do with her account. (*See* ECF No. 48-2 at 18.) Hughes's mother responded that she

wanted to withdraw $100,000. (*See id.*) Shafer informed them the bank could not perform such a

large transaction. (*See id.*) In response, Hughes said "we need to figure out something for [my

mother] to get what she needs because she's not in good shape and she ain't going to be able to keep coming back to the bank." (*Id.*) Shafer then offered to withdraw $5,000, to which Hughes responded that he did not know whether his mother would "make it back to the bank to collect this money, $5,000 at a time or whatever," and that "we need to figure out some way for me to be able to help her." (*Id.* at 18–19.) Hughes testified that, "for the most part, . . . [Branch employees] just stood and stared at me." (*Id.* at 19.) He also alleges that, around this time, Shafer laughed again. (ECF No. 22 at 10.)

Dustin Wilder, another Branch employee, soon intervened. (ECF No. 48-2 at 19.) He informed Hughes and his mother that withdrawals greater than $10,000 would require the accountholder to complete IRS paperwork. (*Id.*) Hughes responded that he did not care and that he did not have to fill out any paperwork, as it was his mother's money. (*Id.*) Hughes then asked Wilder whether he "work[ed] for the IRS." (*Id.*) When Wilder said no, Hughes asked "so why do you do their paperwork?" (*Id.*) In response, Wilder "went silent," after which there was "[a] lot of just standing there staring." (*Id.*) Hughes alleges that, around this time, Shafer laughed a third time. (ECF No. 22 at 11.)

At that point, Hughes "kept saying [they] need[ed] to figure out something to help [his] mother." (ECF No. 48-2 at 19–20.) He "probably said that maybe five to ten times" but "never got an answer." (*Id.* at 20.) Hughes does not believe he raised his voice during the exchange, but acknowledged he is "kind of loud" and that "somebody that never met me . . . may think I'm being a little loud." (*Id.*) But he also testified he "had no anger because [he was] just trying to help [his] mother" and that "it wasn't . . . personal to [him] to fight [the bank employees] about it." (*Id.*) The Branch's employees did not immediately respond to Hughes's repeated requests. (*Id.* at 22.)

The record is unclear about the timing of the Branch's employees' contacts with offsite personnel. The parties agree that, around the time of Hughes's repeated requests, Wilder spoke on

3

the phone with acting branch manager Dawn Lewis, who was working that day out of M&T Bank's location in LaVale, Maryland. (ECF No. 48-1 at 6; ECF No. 22 at 4.) Defendants' submission suggests this was the first time a Branch employee reached out to Lewis about Hughes. (*See* ECF No. 48-1 at 6.) But Hughes alleges that Shafer and Sonya Muhleman, a third employee of the Branch, had by then already spoken to Lewis for several minutes, starting when Hughes exited the bank to retrieve his mother.[3] (*See* ECF No. 22 at 3–4; ECF No. 48-2 at 21.)

Separately, the parties agree that, around 12:09 p.m., Lewis placed a 911 call to Allegany County emergency services. (ECF No. 48-1 at 4; ECF No. 22 at 4–5.) But while Defendants suggest the 911 call occurred immediately after Lewis spoke with Wilder, (*see* ECF No. 48-1 at 4), Hughes alleges Lewis called 911 only after also speaking with Shafer and Muhleman a second time, (*see* ECF No. 22 at 4–5, 10–11; *see also* ECF No. 50 at 17).

Either way, when Lewis called 911, she informed the dispatcher of an "irate" customer who was "threatening" the Branch's staff, "just being very rude," and making the Branch's staff "feel very uncomfortable right now." (ECF No. 22 at 15.) Lewis also expressed that "we don't know if he's . . . trying to take advantage of his mother and trying to get her to put all the money into his account." (*Id.*) Lewis asked the dispatcher to get "somebody to go out there as soon as possible . . . to escort the gentleman out." (*Id.*) The dispatcher obliged. (*See id.* at 16–17.)

While Lewis remotely placed the 911 call, Hughes continued to interact with the Branch's staff. (*See* ECF No. 22 at 11.) Eventually, Muhleman asked Hughes whether he wanted to open a bank account. (ECF No. 48-2 at 22.) Hughes responded "[o]kay, I'll take a bank account because then I can get [my mother] on the internet, transfer the money to an account with my name and give it to her, do whatever she wanted." (*Id.*) Around 12:12 p.m., Muhleman invited Hughes, his

---

[3] Before his late 2021 visit to the Branch, Hughes had never met Shafer or Wilder, (ECF No. 48-2 at 29–30), and as of his deposition in late July 2024, had still never met Lewis, (*id.* at 33). By contrast, Hughes was "pretty sure" he had met Muhleman once before, when he last visited the Branch fifteen to eighteen years prior. (*See id.* at 31–32.)

mother, and his companion—who had by then entered the bank—into her office. (*Id.* at 23; ECF No. 22 at 11.) Once all four people had gathered inside, Hughes provided Muhleman his driver's license and Social Security number for the purpose of opening an account. (ECF No. 48-2 at 23–24.) During this exchange, Muhleman says, Hughes was "not 'irate' or 'threatening,' but was somewhat short-tempered." (ECF No. 50 at 4.)

Wilder entered Muhleman's office around 12:15 p.m. (*See* ECF No. 22 at 11; ECF No. 48-2 at 24.) Defendants suggest this was to tell Muhleman the police had arrived. (*See* ECF No. 48-1 at 6.) But Hughes testified that, as Wilder entered, Wilder simply remarked to Muhleman "[y]ou don't have to do this," then "stood behind her . . . and then just stood there and waited for . . . the police to come [in]." (ECF No. 48-2 at 24.) In any case, at least one police officer entered Muhleman's office and began to speak with Hughes. (*Id.* at 24–25.) Because Hughes had not seen other customers for "[p]robably ten minutes or a little more," he suspected the police had come for him. (*See id.* at 25–27.)

The officer then asked Hughes for identification. (ECF No. 48-2 at 28.) Hughes refused. (*Id.*) The officer asked again. (*Id.*) Hughes asked "[w]hat for?" (*Id.*) The officer replied that he was investigating "[t]respassing and disorderly." (*Id.*) Hughes responded "[i]f I'm under arrest, I'll give you my ID." (*Id.*) The officer said "[o]kay. You're under arrest. Now give me your ID." (*Id.*) Hughes again refused. (*Id.*) Around 12:17 p.m., the officer began to handcuff Hughes and escort him outside to a police vehicle. (*See id.* at 29; ECF No. 22 at 12.) Hughes testified that he was cooperative. (ECF No. 48-2 at 29.) He also acknowledged at some point handing, or trying to hand, his identification to his companion. (*See id.* at 29; ECF No. 50 at 19.)

After the arrest, police took Hughes to the Allegany County Detention Center. (*See* ECF No. 48-2 at 9–11.) He testified he was held there for nine and a half hours. (*Id.* at 10.) While he was there, he was held in an individual cell, although he and the other inmates could still see each

5

other. (*Id.*) Officers at the jail told Hughes that he was not being cooperative and that he was, "in so many words, . . . resisting arrest." (*Id.* at 11.) According to Hughes, "[w]hen [he] went into the jail, [he] told them that [he was] going to uphold [his] rights, and it was nothing against them, but [he was] going to uphold [his] rights." (*Id.*)

Hughes avers a variety of physical and psychological symptoms as a result of these events. Physically, he says he now has trouble sleeping, experiences heart palpitations, undergoes bouts of stomach pain and nausea, and suffers from frequent headaches and migraines. (ECF No. 50-2 at 2–3.) Psychologically, he says he experiences nightmares and night terrors; the feeling that he has lost his freedom; an inability to leave home by himself; "complete[] dependen[ce] on having a companion"; symptoms of agoraphobia, claustrophobia, and cleithrophobia,[4] the latter of which he attributes to "being chained up like an animal while in the presence of the police [in] the back of the police vehicle"; feelings of being "constantly on edge, irritable, paranoid, and anxious," which he says "has put a serious strain on [his] relationships"; and regular panic attacks at the thought of going to the bank or encountering the police. (*Id.*) He cites feelings of stigma; loss of credibility among friends and family; "hopeless[ness] and helpless[ness]"; exhaustion; "extreme shame, embarrassment, and sadness knowing [his] future has been jeopardized by a permanent arrest record that [he] will always have to explain"; and "[a]nger and inconsolable sadness [from] missing all that precious time with [his] mom trying to prove [his] innocence."[5] (*Id.* at 4.) He also identifies a profound loss of trust in public institutions and in "the goodness of people." (*Id.* at 3.)

---

[4] Although standard dictionaries do not define this term, various online sources use it to refer to a fear of confinement or lack of escape, similar to but distinct from claustrophobia. *See, e.g.*, Lisa Fritscher, *Understanding Cleithrophobia, or the Fear of Being Trapped*, Verywell Mind (July 31, 2024), https://www.verywellmind.com/cleithrophobia-2671737.

[5] The record shows that Hughes's mother passed away in late November 2022, eleven months after the incident at the bank. (ECF No. 22 at 19.)

He has told others that, in short, he "will never be whole again." (*Id.* at 4; ECF No. 22 at 18; *see generally* ECF No. 48-3 at 5–7.)

Although Hughes's companion affirms Hughes's list of symptoms, (*see* ECF No. 50-3 at 2–5), the record indicates that Hughes has not been professionally diagnosed with, nor sought professional treatment for, any of the symptoms—physical or psychological—he says he now experiences. (*See* ECF No. 48-2 at 4–6.) Hughes ostensibly takes issue with this characterization, (*see* ECF No. 50 at 20), but ultimately offers evidence only of his self-diagnoses, which he appears to suggest are as good as (if not better than) professional diagnoses, given that health professionals would rely on his own descriptions of his symptoms in any event, (*see id.* at 11–12).

## B. Procedural History

On July 24, 2023, Hughes sued both the South Cumberland branch of M&T Bank and Rene F. Jones, M&T Bank's chairman and CEO.[6] (ECF No. 1 at 2.) Hughes alleged violations of his rights under the Constitution, the United Nations' Universal Declaration of Human Rights, and a bevy of federal banking and consumer protection statutes. (*Id.* at 3, 6–13.) He also brought common law claims of defamation, IIED, and fraud, (*id.* at 14–21), and sought to invoke rights of action under the concepts of coercion, conspiracy, and entrapment, (*id.* at 22–24). M&T Bank and Jones moved to dismiss. (ECF No. 3.)

On August 16, 2023, before the Court could rule on Defendants' motion, Hughes filed an amended complaint, adding Lewis, Muhleman, Wilder, and Shafer as defendants, but otherwise asserting identical claims. (ECF No. 7 at 3, 6, 9–27.) Defendants again moved to dismiss. (ECF No. 9.) The Court granted the motion, (ECF Nos. 19–20), dismissing with prejudice all claims against Jones, (ECF No. 19 at 4–5); all claims alleging violations of rights under the Constitution,

---

[6] Around the same time, Hughes sued various state and local officials on claims arising from the same events. (*See generally* Civ. Nos. JKB-23-1974, -1994 to -1997.) Those claims were soon consolidated, (Civ. No. JKB-23-1974, ECF No. 4), and later dismissed with prejudice, (*id.*, ECF Nos. 39–40).

the Universal Declaration of Human Rights, and various federal statutes, (*id.* 5–6); all defamation claims, (*id.* at 6–7); all fraud claims (*id.* at 7–8); and all claims invoking concepts of coercion and entrapment, (*id.* at 9–10). At the same time, the Court dismissed without prejudice Hughes's IIED and conspiracy claims, with respect to which the Court granted Hughes leave to amend his complaint a second time. (*Id.* at 8–14.)

On January 2, 2024, Hughes filed his Second Amended Complaint, (ECF No. 22), which Defendants moved to dismiss shortly afterward, (ECF No. 24). The Court granted the motion in part, dismissing Hughes's conspiracy claim while holding that, as amended, the pleadings stated a claim for IIED under Maryland law. (ECF No. 31 at 5–6.) On September 16, 2024, after the close of discovery, Defendants moved for summary judgment on the remaining IIED claim. (ECF No. 48.)

## II.    LEGAL STANDARD

To earn summary judgment, the moving party must articulate a legally valid claim or defense and show "no genuine dispute as to any material fact" in support thereof. *See* Fed. R. Civ. P. 56(a). The nonmoving party must then respond by "set[ting] forth specific facts showing that there [remains] a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003). At each stage, the Court views the facts and draws reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). If the Court determines a reasonable jury could find in that party's favor, summary judgment will be denied. *See Anderson*, 477 U.S. at 248. But the nonmoving party cannot rest on mere denials. It must set out its own specific facts showing a genuine dispute. *Bouchat*, 346 F.3d at 525 (citation omitted). This requires more than a "scintilla of evidence." *Anderson*, 477 U.S. at 252.

Documents filed pro se will be "liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94

8

(2007) (citation omitted). This additional consideration is not without limits, however. "Although courts must liberally construe the claims of pro se litigants, the special judicial solicitude with which a district court should view pro se filings does not transform the court into an advocate." *United States v. Wilson*, 699 F.3d 789, 797 (4th Cir. 2012) (cleaned up).

## III.   ANALYSIS

To succeed on a claim of IIED under Maryland law,[7] a plaintiff must prove all four elements of the IIED tort. *See Batson v. Shiflett*, 602 A.2d 1191, 1216 (Md. 1992). First, the defendant's conduct must be "intentional or reckless." *Id.* Second, that conduct must also be "extreme and outrageous." *Id.* Third, that conduct must have factually and proximately caused plaintiff's emotional distress. *Id.* Fourth, the plaintiff's emotional distress must be "severe." *Id.*

Defendants offer three arguments for summary judgment. First, they argue Hughes cannot satisfy the second element of the IIED tort, as Defendants' acts were not extreme and outrageous under Maryland law. (*See* ECF No. 48-1 at 8–16.) Second, they argue Hughes cannot satisfy the third element of the IIED tort, as Defendants' acts did not factually or proximately cause Hughes's injuries. (*See id.* at 17–21.) Third, they argue Hughes cannot satisfy the fourth and final element of the IIED tort, as Hughes's injuries are incapable of objective assessment and therefore cannot be shown to be "severe." (*See id.* at 21–24.)

The Court is persuaded by the first argument, and therefore need not consider the second or third. Defendants have shown that, as a matter of Maryland law, the record does not support a

---

[7] Maryland law governs what remains of this dispute. At the outset, the Court exercised federal-question jurisdiction over Hughes's federal-law claims and supplemental jurisdiction over his state-law claims. (*See generally* ECF No. 1.) Despite having long dismissed all of Hughes's federal claims, (*see generally* ECF Nos. 19–20), the Court has, in its discretion, elected to retain its supplemental jurisdiction over the residue of Hughes's case, including his now-standalone IIED claim. *See* 28 U.S.C. § 1367(c)(3); *see also Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). Federal courts exercising supplemental jurisdiction over residual state claims apply the choice-of-law rules of the forum state. *See ITCO Corp. v. Michelin Tire Corp., Com. Div.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983) (citing *Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487 (1941)). In tort cases, Maryland courts apply *lex loci delicti*, or "the law of the place of the wrong." *Dr.'s Weight Loss Ctrs., Inc. v. Blackston*, 319 A.3d 1102, 1111 (Md. 2024). Because Hughes's claim concerns acts that occurred entirely in Maryland, (*see generally* ECF No. 22), Maryland law applies.

finding that Defendants acted in an extreme and outrageous manner.[8]  Hughes does not adduce

facts that could lead a reasonable factfinder to conclude otherwise.  Summary judgment is therefore

appropriate.

To start, the IIED tort is used only "sparingly."  *KFC Nat'l Mgmt. Co. v. Weathersby*, 607

A.2d 8, 11 (Md. 1992) (citation omitted).  Its elements are "rigorous, and difficult to satisfy."  *Id.*

(quoting W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 12 (5th ed. 1984)); *accord*

*Brown v. Harford Bank*, Civ. No. ELH-21-0096, 2022 WL 657564, at \*16 (D. Md. Mar. 4, 2022)

("Generally speaking, claims for IIED are disfavored, difficult to establish and, as such, 'rarely

viable.'" (citation omitted) (collecting cases)).  As of 2021, Maryland's courts had sustained claims

for IIED a mere four times.  *Haines v. Vogel*, 249 A.3d 151, 163–64 (Md. Ct. Spec. App. 2021)

(collecting cases).

"[D]espite its apparent abundance of elements, in practice [the IIED tort] tends to reduce

to a single element—the outrageousness of the defendant's conduct."  *KFC*, 607 A.2d at 11

(citation omitted); *see also id.* ("[T]he basic issue is the behavior of the defendant.").  This element

is satisfied by only those acts "so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized community."  *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977) (quoting Restatement

(Second) of Torts § 46 cmt. d (Am. L. Inst. 1965)).  "[M]ere insults, indignities, threats,

annoyances, petty oppressions, or other trivialities" are not enough, and would-be plaintiffs "must

necessarily be expected and required to be hardened . . . to occasional acts that are definitely

inconsiderate and unkind."  *Id.*

---

[8] Because Defendants' argument on this score stands primarily on the ground that the record *lacks* evidence to support that element of Hughes's claim, (*see generally* ECF No. 48-1 at 8–16), the Court does not address Defendants' briefing on this topic other than to acknowledge that Defendants have met their burden of "affirmatively show[ing] the absence of evidence in the record," as Rule 56 requires. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331–32 (1986) (Brennan, J., dissenting).

"Extreme and outrageous" is an objective standard, applied from a societal viewpoint, not from the viewpoint of the person who experienced the acts at issue. *See* Restatement (Second) of Torts § 46 cmt. d (Am. L. Inst. 1965) ("Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"). This means "there is no liability simply for the intentional infliction of emotional distress." *KFC*, 607 A.2d at 11 (citation omitted). Rather, even "[i]f a defendant intends to cause a plaintiff emotional distress *and succeeds in doing so*, the defendant is nonetheless *not* liable unless his or her conduct is also extreme and outrageous" to an objective observer. *See id.* (first emphasis added) (citation omitted).

Notwithstanding this extremely narrow pathway to recovery, Hughes's Second Amended Complaint does set out a legally valid theory of IIED. The nub of Hughes's claim is that Defendants provided false or exaggerated information on a 911 call to "discredit . . . [and] humiliate [him], [his] dignity and [his] standing," and otherwise to "deflect the blame" away from M&T Bank for failing to assist Hughes and his mother with their requests. (*See* ECF No. 22 at 9.) And as the Court previously observed, "even Defendants admit that an IIED claim based on a false statement to the police is viable if 'the false statement made to law enforcement [was] motivated by some clear animus or bad intent.'" (ECF No. 31 at 4 (alteration in original) (quoting ECF No. 24-1 at 10).)

It was on this ground—that Hughes *could* theoretically show that Defendants committed IIED by invoking the police for the purpose of harassment and humiliation—that the Court previously allowed the case to proceed.[9] (*See* ECF No. 31 at 4–5.) In so holding, the Court noted

---

[9] For purposes of assessing the propriety of the 911 call, the Court does not distinguish between the offsite employee (Lewis) and the three onsite employees (Shafer, Wilder, and Muhleman). Both the Defendants and the Court have acknowledged that all four individual defendants were privy to (and/or had shared among themselves) the same information and beliefs about Hughes. (*See* ECF No. 31 at 5.) And insofar as it remains unclear whether, and to what extent, all four Defendants were behind the decision to call 911, the Court assumes this fact in Hughes's favor.

that a factfinder could "infer that the bank environment added to the power differential between Hughes and the Defendants." (*Id.* at 5.) That, in turn, could inform the factfinder's assessment of how extreme and outrageous Defendants' conduct was. *See, e.g.*, *KFC*, 607 A.2d at 15 ("It is only natural that a defendant's position of power over a plaintiff may enhance his or her ability to do harm."); *see also* Restatement (Second) of Torts § 46 cmt. e. The Court also noted that a factfinder could conclude that the decorous environment of a bank "may have . . . contributed to Hughes's fear and distress." (ECF No. 31 at 5.) And had Defendants known of some unique sensitivity on Hughes's part, their behavior would be even "more likely to warrant condemnation than if [they] had been unaware of [Hughes's] particular vulnerability." *KFC*, 607 A.2d at 12. Finally, the Court observed that whether Lewis actually believed what she told the 911 operator was "a factual determination the Court cannot make at this stage." (ECF No. 31 at 5.)

But while Hughes's theory remains cognizable as a legal matter, it finds inadequate support in the record to justify proceeding to trial. For one, the record reveals a variety of questionable or disquieting conditions that could make ordinary people uncomfortable. Over the nearly twenty minutes before Lewis called 911, Hughes spoke loudly and repetitively. (*E.g.*, ECF No. 48-2 at 20 ("I probably said that maybe five to ten times . . . ."); *id.* ("I'm kind of loud."); *id.* ("I may have been [speaking loudly], in their opinion. I'll say that.").) He was quarrelsome. (*See, e.g.*, *id.* at 19 ("[Wilder] said . . . we'd have to fill out IRS paperwork. And I said I don't care about that. I don't have to fill nothing out. It's her money. Tell her."); *id.* ("I asked [Wilder] do you work for the IRS? And he said no. And I said so why do you do their paperwork?").) Multiple times, the parties stood silently and stared at one another. (*See, e.g.*, *id.* at 19, 21.) Hughes's mother was visibly frail. (*See id.* at 16 ("She's in a wheelchair and with an oxygen bottle."); *see also* ECF No. 22 at 14 (surveillance image of Hughes's mother).) And despite some dispute over what Hughes asked for when he *first* entered the bank, (*compare* ECF No. 48-2 at 16 ("I had a question of how

12

much money could my mother withdraw before I had brought her in?"), *with* ECF No. 48-1 at 4 ("Plaintiff initially requested to make a $100,000.00 withdrawal from his mother's account.")), his mother later made clear she sought to withdraw a large sum of money. (*See* ECF No. 48-2 at 18 ("[T]hey asked [her] what she wanted and she wanted now to withdraw $100,000 . . . .").)

Even if Defendants were in fact wrong about Hughes's actions and motivations that day— wrong to think he was irate and threatening, and wrong to suspect him of elder financial abuse— calling 911 under such conditions does not "go beyond all possible bounds of decency," *Harris*, 380 A.2d at 614 (citation omitted), at least so long as Defendants actually believed what Lewis told the police. *See, e.g.*, *Kumar v. Mahone*, Civ. No. GLH-21-0735, 2022 WL 279798, at *6 (D. Md. Jan. 31, 2022) (describing conduct that included providing false information to police as "certainly inappropriate, but . . . not 'beyond all possible bounds of decency'"); *Scott v. Old Navy, LLC*, Civ. No. GLH-18-1189, 2020 WL 510228, at *8 (D. Md. Jan. 31, 2020) (describing calling 911 with erroneous information, then refusing to cancel that call, as "not ris[ing] to the level of extreme and outrageous behavior"), *vacated in part on other grounds*, No. 20-1253, 2022 WL 2764415 (4th Cir. July 15, 2022). On the contrary, the most that could be said is that Defendants overreacted. And because emergency services exist in large part to absorb the risks of putative hazards, the Court is particularly disinclined to hold that a reasonable factfinder could conclude it "go[es] beyond all possible bounds of decency" for someone to call 911 based on a sincere belief— however misguided or ultimately unjustified—that police would defuse what that person perceived as a potentially dangerous situation.[10] (*See* ECF No. 48-1 at 12 (collecting cases).)

---

[10] Similarly, no reasonable factfinder could conclude calling 911 is "extreme and outrageous" simply because an arrest is "an unpleasant experience causing unnecessary stress and humiliation." (ECF No. 50 at 22.) Again, a critical feature of "extreme and outrageous" conduct is its "utter[] intolerab[ility] in a civilized community." *See Harris*, 380 A.2d at 614 (citation omitted). Arrests may be "unpleasant" and cause "unnecessary stress and humiliation," but plenty of other routine conduct fits that description, too. *See, e.g.*, Restatement (Second) of Torts § 46 cmt. d ("There is no occasion for the law to intervene in every case where [someone's] feelings are hurt."). And unlike the ability of police to effect an arrest, much of that conduct serves little or no salutary social purpose, much less one authorized by law.

The only conceivable way to recover for IIED on these events is if Hughes could prove Defendants summoned the police for reasons entirely unrelated to the observable facts described above. Hughes insists this is what happened. (*See, e.g.*, ECF No. 50 at 21 ("Lewis knowingly called 911 expecting it to be a vexing experience causing me[n]tal anguish and an added stress to an already stressful situation.").) But while simply asserting that Defendants sought to cause pain may have been enough to survive a motion to dismiss, (*see* ECF No. 19 at 12; ECF No. 31 at 4), it is not enough to survive summary judgment. Notwithstanding Hughes's certainty in his own characterization of these events, he adduces no actual evidence that Defendants called the police for malicious or contrived reasons. Instead, he repeatedly highlights the acts he says caused him stress that day, (*see, e.g.*, *id.* at 9 ("I am begging and pleading for help [with my mother's account] with no avail just stares and silence.")), as well as his view that Defendants were wrong to see him as a threat, (*see, e.g.*, *id.* at 23 ("Muhleman decided that a call to 911 was a better option than to ask me to leave . . . .")).

That is not enough. On the requirement of "extreme and outrageous" conduct, Hughes's mere subjective belief that something nefarious occurred, absent concrete, objective evidence of the same, is inadequate to marshal the support of a reasonable factfinder. *See Bouchat*, 346 F.3d at 522. Defendants have earned summary judgment.

## IV.   CONCLUSION

The primary purpose of summary judgment is to keep factually unsupported cases from proceeding to trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). A litigant survives summary judgment only if he provides enough evidence for an objective, reasonable factfinder to believe in the merits of his argument. *Anderson*, 477 U.S. at 252. This requires more than bare suspicions and accusations of wrongful behavior. *Id.*

14

But aside from the facts recounted above, Hughes offers no objective evidence of Defendants' motivations or states of mind. If reasonable people could differ about whether Defendants' acts were "extreme and outrageous," Hughes's claim would move forward. *E.g.*, *Harris*, 380 A.2d at 615. But that is not the case. The record offers no reason to believe—and therefore no reasonable factfinder could conclude—that Defendants called the police for reasons unrelated to Hughes's outward behavior and the nature of his and his mother's requests. As a result, there is no room to find that Defendants' acts were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harris*, 380 A.2d at 614 (citation omitted).

Because Hughes has not assembled enough facts in support of an essential element of his IIED claim, he is unable to show that a reasonable factfinder could decide in his favor at trial.

Defendants' Motion for Summary Judgment will be granted.

DATED this **17** day of December, 2024.

BY THE COURT:

James K. Bredar
United States District Judge